# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

YVETTE F.,[1]

Plaintiff,

v.                                              ACTION NO. 2:22cv311

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

Defendant.

.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Yvette F. filed this action for review of a decision by the Commissioner ("Commissioner")

of the Social Security Administration denying her claim for a period of disability and disability

insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and

XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 10. The Court

recommends that plaintiff's motion for summary judgment (ECF No. 12) be **DENIED**, and the

Commissioner's motion for summary judgment (ECF No. 14) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name
has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S.,
Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

# I.      PROCEDURAL BACKGROUND

Yvette F. ("plaintiff") protectively filed applications for benefits on July 24, 2020, alleging disability beginning on June 1, 2020, due to high blood pressure, diabetes type 2, amputation of a toe, and cataracts.  R. 15, 241–49, 276.[2]  Following the state agency's denial of her claim, both initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  R. 94–109, 112–29, 165–67.  ALJ Carol Matula held a telephonic hearing attended by plaintiff and her attorney on November 3, 2021, and issued a decision denying benefits on December 9, 2021.  R. 15–34, 40–73.[3]  On May 16, 2022, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–5.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on July 20, 2022.  ECF No. 1.  The Commissioner answered on September 22, 2022.  ECF No. 8.  In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment on November 3 and December 2, 2022, respectively.  ECF Nos. 12–15.  Plaintiff filed a reply on December 16, 2022.  ECF No. 16.  As oral argument is unnecessary, this matter is ready for a decision.

# II.     RELEVANT FACTUAL BACKGROUND

## A.    *Background Information and Hearing Testimony by Plaintiff*

During the hearing before the ALJ on November 3, 2021, plaintiff provided the following information.  At that time, the 50-year-old plaintiff lived alone in a one-bedroom apartment.  R.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[3] On September 9, 2014, plaintiff was denied benefits pursuant to previous applications for DIB and SSI.  R. 77–87.

46, 241.  Plaintiff has a high school diploma and most recently worked in 2020 as a personal care aide in individual homes assisting clients with various activities, including bathing, personal care, cooking, and cleaning.  R. 47–48.

Plaintiff takes medication for diabetes, blood pressure, depression, and pain.  R. 49–50. Plaintiff also reported receiving treatment for depression from the Community Services Board.  R. 50–52.  She stopped mental health therapy approximately one year before the hearing due to transportation issues, but continued taking medication, which made her sleepy.  R. 50–52, 57.

Plaintiff testified that, following the amputation of a toe on her right foot, she experienced constant pain in her right foot, as well as pain that came on suddenly in her right foot, shot up her leg, and sometimes caused her to fall.  R. 52, 54, 64–65.  She had trouble with calluses and swelling.  R. 52–53. Following the surgery, her podiatrist prescribed a boot, and her primary care doctor prescribed a walker.  R. 53–54.  Plaintiff stated that she could only stand for 10 to 20 minutes before her foot swells.  R. 55.  She performed toe exercises, but was precluded from other exercise by her podiatrist.  R. 62.

Plaintiff explained that she did some housecleaning, but also received help from friends. R. 60.  She prepared simple meals in the microwave or oven that did not require constant standing. *Id.*  She read the Bible and played games on her phone.  R. 60–61.  Her brother visited three to four times each week.  R. 61.  He took plaintiff to the grocery store or purchased groceries for her if her foot and ankles were too painful.  R. 47.  After her foot surgery, her brother started doing her laundry.  R. 61.

At the time of the hearing, plaintiff was concerned that she may have an infection in her foot.  R. 63.  She bathed using water from her sink while sitting in a shower chair.  R. 63–64.

In a September 2020 function report, plaintiff reported foot pain and the need to wear a

3

boot or special shoe that made walking difficult.  R. 291.  In response to an inquiry into whether

the boot or shoe were prescribed by a doctor, plaintiff answered, "I forgot."  R. 297.  She checked

boxes indicating that her conditions diminished her abilities to lift, bend, stand, reach, walk, sit,

and climb stairs.  R. 296.  She reported that she could walk five minutes before she would need to

rest for 90 minutes.  *Id.*  She indicated that her ability to follow written instructions was "good,"

she followed spoken instructions "well," and got along with authority figures "well."  *Id.*  She did

not report problems with memory, completing tasks, concentrating, or understanding.  *Id.*  She

stated that she occasionally prepared easy meals, attended church regularly, shopped online for

clothes and food, and had no issues with handling money such as paying bills, counting change,

handling a savings account, and using a checkbook.  R. 293–95.

   In a January 2021 function report, plaintiff reported that she needed assistance with her

hair, with getting off of the toilet, and with cleaning her bathtub.  R. 325, 327.  She indicated that

she could walk for 20 minutes before needing to rest for "a long time."  R. 330.  She described her

ability to follow written and spoken instructions, and get along with authority figures as "good."

R. 330–31.  She reported doing laundry and cleaning the bathroom two times a week for two hours

while sitting in a chair, but needing help cleaning the tub.  R. 327.  She again reported preparing

easy meals, shopping online, and handling money, but could no longer go to church.  R. 327–29.

She indicated that she handled changes in routine "ok."  R. 331.  She had a fear of falling, and was

prescribed a walker, brace, and splint the previous year that she used constantly.  *Id.*

**B.**  ***Hearing Testimony by Vocational Expert***

   Asheley Drexel Wells, a vocational expert ("VE"), also testified at the hearing.  R. 66–72.

VE Wells stated that a claimant of plaintiff's age, education, work history, and RFC could not

perform plaintiff's past relevant work as a personal care assistant, which requires medium exertion

as generally performed per the Dictionary of Occupational Titles ("DOT")[4] and heavy exertion as actually performed. R. 67.

The ALJ presented VE Wells with a hypothetical premised on a person of plaintiff's age, education, and work history, who is limited to: (a) no more than a light exertional level; (b) standing and walking for 4 hours a day; (c) occasionally climbing ramps, stairs, ladders, ropes, and scaffolds; (d) frequently balancing and stooping; (e) occasionally kneeling, crouching, and crawling; and, (f) performing simple, routine jobs. R. 68–69. VE Wells testified that such a person could perform work as a cashier, ticket taker, and gate guard.[5] R. 69. VE Wells reduced the number of cashier jobs available by half to accommodate the limitation to 4 hours standing. *Id.*

VE Wells testified that a claimant would be unable to work in any of these positions if she needed a walker to ambulate, if she would have two or more unexcused absences per month, or if she would be off task more than 10% of the time. R. 71.

The ALJ then inquired if the job requirements in the DOT conflicted with the hypothetical limitations initially identified. R. 71–72. VE Wells responded that the hypothetical modified the light exertional level by limiting standing to four hours, and that her testimony about this

---

[4] The *Dictionary of Occupational Titles*, and its companion, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, are resources used by the SSA that review occupations present in the national economy and discuss physical and mental requirements pertaining to those occupations. *U.S. Dep't of Labor, Dictionary of Occupational Titles* (4th ed. 1991); *U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993).

[5] The VE also testified that plaintiff was capable of sedentary work, but the ALJ did not rely on this testimony, which would be irrelevant after February 2021 when plaintiff turned 50 years old. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14 ("Grid Rule 201.14"). Grid Rule 201.14 states that an individual aged 50–54 who (1) has no more than a high school education, (2) is precluded from her past relevant work, and (3) is now capable of no more than sedentary exertional work must be found to be disabled. *Id.; see also* Program Operations Manual System, https://secure.ssa.gov/apps10/poms.NSF/lnx/0425025035 (last visited June 16, 2023).

modification as well as her testimony about the use of an assistive device, production rate activity, off-task behavior, and absenteeism were based on her professional experience, education, and research. *Id.*

VE Wells then detailed the normal break schedule in response to a question from plaintiff's attorney. R. 72.

## C.   *Relevant Medical Record*

### 1.   *Jesse N. Anderson, III, DPM, with AAL Podiatry Associates*

Between June 5 and 17, 2020, plaintiff sought treatment from Dr. Anderson four times for a chronic ulcer on her right foot.[6] R. 1193–99. Dr. Anderson assessed chronic ulcer, "[g]as gangrene" of the third right toe, and antibiotic resistant infection. R. 1193, 1195, 1197, 1199. Each time, Dr. Anderson cleansed the wound, applied iodosorb, and continued plaintiff on ibuprofen and naproxen (for pain), glimepiride and Januvia (for diabetes), and Augmentin and Bactrim (antibiotics). *Id.* On June 17, 2020, Dr. Anderson advised plaintiff to go to the emergency department as soon as possible. R. 1193.

Plaintiff returned to Dr. Anderson on November 11, 2020, almost five months following a toe amputation. R. 1191. Physical examination revealed dorsalis pedis artery pulse of 1+/4 bilaterally and posterior tibial artery pulse of 1+/4 bilaterally, as well as thickened, yellow, brittle nail plates. *Id.* Examination also revealed no edema, paresthesia, burning, numbness, or ulcers. *Id.* Lastly, plaintiff had normal skin temperature, turgor (elasticity), and pigmentation, with no scaling, vesicles, or stasis changes. *Id.* Dr. Anderson assessed type 2 diabetes mellitus with hyperglycemia, nail fungus, and toe amputation. *Id.* He debrided plaintiff's toenail, removing the

---

[6] Treatment of this diabetic foot ulcer began in January 2020 before plaintiff's alleged onset date. R. 1229.

diseased portion, and directed plaintiff to follow up in three months. *Id.*

Dr. Anderson performed a visual examination of plaintiff's foot on February 12, 2021, but made no notations regarding any findings. R. 1189.

### 2.     *Sentara Health*

On June 21, 2020, plaintiff was admitted to the hospital for treatment of her third toe on her right foot for infection stemming from a diabetic foot ulcer.[7] R. 471–72; *see* R. 480 (x-ray revealed "septic joint/osteomyelitis"); R. 483 (assessing possibility of gangrene).

On June 24, 2020, Tracy Klimaz, DPM, amputated plaintiff's right third toe. R. 422–27, 510–12. IV antibiotics were started to treat her residual osteomyelitis, with placement of a PICC (peripherally inserted central catheter) line for home IV antibiotic treatment. R. 425, 619–21. Plaintiff worked with physical therapy and occupational therapy. R. 425, 522. She was discharged on June 29, 2020, with home health care support and instructions to remain non-weightbearing on her right foot in a post-op shoe. R. 422, 425–26.

In a post-operative follow-up with Dr. Klimaz on July 9, 2020, plaintiff reported no pain (0/10). R. 464. An examination revealed no evidence of infection, inflammation, or drainage, and the "incision [was] well coapted proximally however distal dehiscence [separation of wound edges] measures approximately 0.5 cm." R. 466.

Approximately two hours later on July 9, 2020, plaintiff was treated at the Sentara emergency department due to her PICC line starting to pull out of her arm. R. 460, 463. The PICC line was flushed without issues and plaintiff was discharged home. R. 460. X-rays showed PICC

---

[7] Psychological examinations performed during her hospital stay, both before and following her surgery indicate plaintiff had an appropriate affect and mood, her recent and remote memory were intact, and she was oriented to time, place, and person. R. 493, 515. Prior to surgery, plaintiff was feeling well, walking about the room, and in a very cheerful mood. R. 498.

line was in a satisfactory position. R. 588–89.

On July 15, 2020, plaintiff was seen in the emergency department after her PICC line was displaced by a home health nurse and taken out that morning. R. 451. Plaintiff was able to move all extremities and denied numbness or tingling. R. 454. On examination, plaintiff exhibited a full passive range of motion without pain, a normal range of motion, and no swelling. R. 453. She was alert and oriented with normal attention, perception, mood, and affect. *Id.* Plaintiff was given antibiotics, observed overnight, and discharged following replacement of the PICC line. R. 451–52, 584–87. Plaintiff reported on July 16, 2020, before discharge that her pain was "completely gone." R. 456; *see* R. 447 (plaintiff returned to the emergency department on July 17, 2020, requesting a sterile dressing change due to some bleeding at the site of the PICC line, as well as extension tubing).

On July 23, 2020, plaintiff returned to Dr. Klimaz with an open wound and pain of ten out of ten. R. 444. Examination revealed "incision dehiscence with stage II ulceration however there is approximately 20% fibrotic tissue." R. 446. Dr. Klimaz performed an excisional debridement, immobilized plaintiff's foot in a cam boot, and directed plaintiff that she must comply with partial weightbearing. R. 444.

Plaintiff had a post-operation office examination by Dr. Klimaz on September 23, 2020. R. 777–79. Plaintiff reported complete healing of the wound and an examination revealed a "well-healed" incision "without evidence of dehiscence or infection to the amputation site." R. 778–79.

Plaintiff called Sentara Podiatry Specialists on October 5, 2020, requesting that a letter be sent to NRHA (Norfolk Redevelopment and Housing Authority) for the time she was out of work due to the toe amputation. R. 777. The note indicates plaintiff was out of work from June 24, 2020 through September 23, 2020, and a letter was sent to reflect this. *Id.*

8

Over eight months later, on June 23, 2021, plaintiff was treated at the Sentara Heart Hospital for a heart attack. R. 1094–96. Plaintiff reported chest pain radiating to her right shoulder for two to three days. R. 1082, 1089. Her blood pressure was 187/89. R. 1083. Notations indicate plaintiff demonstrated good judgment and insight into her medical condition, was alert and oriented, and her memory was intact. R. 1092. Her physical examination revealed normal muscle tone and normal range of motion throughout with no leg swelling. R. 1083. Luke C. Kohan, M.D., performed a left heart catheterization and coronary angiography. R. 1136–37 (injection fraction 60%). Plaintiff was discharged home on June 25, 2021, on dual antiplatelet therapy and a beta-blocker, as well as medications for hypertension and diabetes. R. 1096. Plaintiff's blood pressure at discharge was 115/59, and her physical examination was normal. R. 1097. She was instructed to follow up with Nurse Practitioner ("NP") Kathryn Langan in one week and was referred to cardiac rehab with directions for therapeutic exercise two to five days per week of increasing duration. R. 1099.

During a follow up appointment at Sentara Cardiology Specialists on September 27, 2021, physician's assistant ("PA") Kristen McElhaney examined plaintiff. R. 1165. Plaintiff's blood pressure was elevated (155/89), and she was prescribed another medication (Imdur) to improve blood pressure control. R. 1164–65, 1168. Plaintiff reported that she had been doing well overall and that her diabetes was "doing much better." R. 1166. She denied chest pain, tightness, pressure, shortness of breath, palpitations, swelling, dizziness, fever, chills, nausea, or vomiting since her discharge. *Id.* Aside from elevated blood pressure, plaintiff's physical examination was normal. R. 1168. Plaintiff was directed to follow a heart healthy diet, perform regular exercise, and schedule a follow-up appointment in three months. R. 1166.

9

### 3.    *EVMS Infectious Disease*

Following plaintiff's toe amputation, plaintiff reported to Patrick Haggerty, M.D., on July 6, 2020, that she felt well and had no complaints.  R. 758, 760.  Plaintiff had a normal examination, including a finding that her gait and stance were normal and her foot looked good with no drainage or swelling.  R. 759.  Plaintiff was directed to continue IV therapy, control her blood sugar to the best of her ability, and follow up in two weeks.  *Id.*

A progress note dated July 15, 2020, indicates that the home healthcare nurse went to plaintiff's home and plaintiff had taken her PICC line completely out.  R. 754, 757.  Plaintiff refused wound care and refused to go back to the hospital to get a new PICC line.  R. 757.  Plaintiff reported feeling well with no complaints, no fever, and no chills.  R. 755.

On August 7, 2020, plaintiff's home healthcare provider reported that plaintiff's PICC line was out, plaintiff refused to have it re-inserted, and plaintiff refused antibiotic treatment.  R. 753, 1071.

Dr. Haggerty treated plaintiff on September 17, 2020.  R. 1071–73.  Plaintiff reported that after the PICC line was out in August, "everything was good."  R. 1071.  Plaintiff had an achy pain on the top of her foot due to neuropathy, but no redness, swelling, tenderness, muscle ache, joint pain, or leg weakness.  *Id.*  The skin was all healed with no ulcer, no drainage, and no induration to soft tissue.  *Id.*  Dr. Haggerty noted plaintiff was obese (BMI 34.54), but otherwise had a normal physical examination.  R. 1072.  He directed plaintiff to call if there was any sign of infection, and talk to her primary care physician about adjusting her pain medications.  R. 1073.

### 4.    *Family Nurse Practitioner Kathryn Langan with Hampton Roads Community Health Center*

On July 29, 2020, NP Langan examined plaintiff in a follow up from the toe amputation surgery.  R. 733–36.  Plaintiff reported "it is doing just fine."  R. 733.  NP Langan noted that

plaintiff had lost her PICC line and the "story is a little unclear about that," but plaintiff conveyed she was scheduled for a follow-up. *Id.* Plaintiff reported that her blood sugar was "better" and being following by her home healthcare provider. *Id.* She denied gait abnormality, loss of strength, dizziness, tingling, or numbness. R. 736. Following a normal examination, NP Langan assessed type 2 diabetes mellitus without complication and without long-term current use of insulin, and amputated toe. R. 734. Plaintiff was provided with a shower chair, counseled to exercise one to two times per week, watch her diet, and follow up in six weeks. R. 734–35.

Plaintiff followed up with NP Langan on August 18, 2021, following her heart surgery. R. 1362–65. Plaintiff denied chest pain, shortness of breath, dizziness, gait abnormality, or loss of strength, and reported no pain (0/10). R. 1362–63. Her blood pressure was 107/70, and her examination was normal. R. 1363–64. NP Langan adjusted plaintiff's diabetes medication, and refilled medication to treat her blood pressure, cholesterol, and seasonal allergies. *Id.* She also set an exercise goal of one to two times per week for plaintiff. R. 1365.

5. ***Medical Source Statements***

a. ***NP Kathryn Langan***

On November 11, 2020, NP Langan completed a one-page, check-the-box, medical source statement form. R. 1069. She listed plaintiff's medical conditions as diabetes type 2, right 3rd toe amputation, diabetic neuropathy, hypertension, and depression. *Id.* These conditions caused lower back pain, knee pain, ankle pain, depression, and anxiety. *Id.* NP Langan stated plaintiff could frequently lift less than 10 pounds, occasionally lift 10 pounds, rarely lift 20 pounds, and never lift 50 pounds. *Id.* In an eight-hour workday, plaintiff could stand or walk less than 2 hours consecutively and about two hours intermittently, she could sit at least 6 hours, and she could constantly use her upper body to reach, handle, grasp, or finger. *Id.* Plaintiff did not need an

11

assistive device to walk, and did not need to elevate her legs at least 15% or more of the day.  *Id.*
NP Langan estimated that plaintiff's medical problems would cause her to be absent from work 2
days a month if she had a job where she could sit, and 4 or more days per month if he had a job on
her feet. *Id.*

### b.      *Jesse N. Anderson, DPM*

On November 17, 2020, Dr. Anderson completed the same one-page, check-the-box,
medical source statement.   R. 1070.   He listed plaintiff's medical conditions as diabetic
neuropathy, diabetic microangiopathy, and amputated third toe.  *Id.*  He found plaintiff could
frequently lift less than 10 pounds, could rarely or occasionally lift 10 pounds, and could never lift
50 pounds.  *Id.*  In an eight-hour workday, plaintiff could stand or walk less than 2 hours, sit at
least 6 hours, and constantly use her upper body to reach, handle, grasp, or finger.  *Id.*  He agreed
with NP Langan that plaintiff did not need an assistive device to walk, and did not need to elevate
her legs at least 15% or more of the day.  *Id.*  He estimated that plaintiff's medical problems would
cause her to be absent from work approximately 2 days a month, and noted that plaintiff "needs
[a] sedentary job."  *Id.*

### 6.      *State Agency Physician Reviews*

On October 8, 2020, Howard Leizer, Ph.D., a state agency consultant, reviewed plaintiff's
medical record. R. 97, 99–100.  He found that plaintiff had mild limitations in her ability to interact
with others; concentrate, persist, or maintain pace; and adapt or manage herself. R. 97.  He found
plaintiff had moderate limitations in her ability to understand, remember, or apply information.
*Id.*  He explained that, although plaintiff scored low on IQ testing in 2012 and reported needing
reminders of doctors' appointments, she was able to complete and return the function report
herself, drive, live alone, care for her personal care and finances, and get along with others,

including authority figures. *Id.* As a result, he concluded plaintiff was able to perform simple, routine tasks, and had no trouble following simple one to two step instructions, but could not follow detailed instructions. R. 99.

On October 5, 2020, Bert Spetzler, M.D., also reviewed plaintiff's medical record and found that, although plaintiff has some pain and difficulty walking three months after her to amputation, "she is healing and progressing well" and "is expected to be able to return to light work that is simple and routine by May 2021." R. 101. He opined that by May 2021, plaintiff would be able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, stand or walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. R. 98.

At the reconsideration level, on January 13, 2021, Joseph Leizer, Ph.D., reached findings almost identical to those of Dr. Howard Leizer. R. 115–16, 118–19. Nicolas Tulou, M.D., also reviewed plaintiff's medical records, finding the evidence consistent with and supportive of the initial decision. R. 118. Dr. Tulou further noted that the wound from plaintiff's toe amputation had "healed completely," and attributed her persistent pain to "the neuropathy." R. 117.

### III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[8] the ALJ followed the five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). Specifically, the ALJ considered whether plaintiff:  (1) was engaged in substantial gainful activity; (2) had a severe

---

[8] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a); 416.905(a). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

13

impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work considering her RFC; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 15–34.

The ALJ found that plaintiff met the insured requirements[9] of the Social Security Act through March 31, 2024, and had not engaged in substantial gainful activity from June 1, 2020, her alleged onset date of disability. R. 18. Plaintiff's earnings in 2020 were under the amount indicative of substantial gainful activity. *Id.*

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) learning disorder; (b) diabetes with generally high A1c levels and diabetic foot ulcers; and (c) obesity. *Id.* The ALJ classified plaintiff's other impairments, including depression, as non-severe. R. 18–19. The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 19–22. In making this finding, the ALJ explained that plaintiff had moderate limitation in her ability to understand, remember, and apply information, and mild limitations in interacting with others, concentrating, persisting, maintaining pace, and adapting or managing oneself. R. 20–21.

The ALJ next found that plaintiff possessed an RFC for light work, *see* 20 C.F.R. §§ 404.1567(b), 416.967(b), subject to the limitations that she: (a) can stand and walk 4 hours per day; (b) can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; (c) can frequently

---

[9] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

balance and stoop; (d) can occasionally kneel, crouch, and crawl; and, (e) is limited to simple, routine jobs. R. 22–31.

At step four, the ALJ decided, based upon the VE's testimony, that plaintiff could not return to her past relevant work as a personal care assistant. R. 31–32.

Finally, the ALJ proceeded to step five, and found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that she could perform other jobs available in the national economy, such as a cashier, ticket taker, or gate guard. R. 32–33.[10]

Accordingly, the ALJ concluded plaintiff was not disabled from June 1, 2020 through December 9, 2021 and was ineligible for DIB or SSI. R. 34.

### IV.    STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

---

[10] The ALJ further found that, before plaintiff turned 50 years old, she could perform the sedentary jobs of addressing clerk, assembler, and lens inserter. R. 33. Lastly, the ALJ found that, before plaintiff turned 50 years old, and if she were restricted to simple, routine, repetitive tasks not at a production rate, she could perform the sedentary jobs of addressing clerk, document preparer, and weight tester. *Id.*

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Johnson*, 434 F.3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.   ANALYSIS

Plaintiff asserts the ALJ erred in two respects. First, the ALJ erred by not including a limitation in plaintiff's RFC after agreeing with the state agency assessment that plaintiff had a moderate impairment in understanding, remembering, applying, or carrying-out detailed instructions. Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") 10. Plaintiff argues that the failure to include a limitation in the RFC is problematic because limitations in the ability to understand and remember detailed instructions creates a conflict with performing jobs requiring reasoning at levels 2 or 3. *Id.* at 10–11. The VE identified three jobs at the light exertional level— ticket taker is a reasoning level two job and cashier and gate guard are reasoning level three jobs. *Id.* at 11.

Second, plaintiff asserts the ALJ erred in rejecting Dr. Anderson's opinion that plaintiff should be limited to sedentary work as the reason given for rejecting Dr. Anderson's opinion is factually inaccurate. *Id.* at 12. Plaintiff asserts that the ALJ rejected Dr. Anderson's opinion

16

"based upon there being no objective findings, signs, or symptoms noted in the record indicating any problems with the ability to stand or walk after September 2020." *Id.* (citing R. 28).

The Commissioner contends that substantial evidence supports the ALJ's RFC, and that the ALJ correctly explained why portions of the state agency physicians' opinions and Dr. Anderson's opinion were not persuasive. Mem. in Supp. of Def.'s Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 15, at 16–20. The Commissioner asserts that the ALJ properly analyzed the opinions for supportability and consistency. *Id.*

**A.    *The applicable methodology for reviewing medical opinions.***

The SSA revised its evidence rules for claims, like plaintiff's, filed on or after March 27, 2017. 82 Fed. Reg. 5844, at 5853–55 (Jan. 18, 2017); *see also* 82 Fed. Reg. 15132 (Mar. 27, 2017) (correcting technical errors in final rule). Under such rules, an ALJ must consider and explain the persuasiveness of each medical opinion in the record.[11] 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the new rules "focus more on the content of medical opinions and less on weighing treating relationships against each other"). ALJ review of medical opinions and findings now is based on: (1) supportability, or the relevance and strength of explanations for the opinion; (2) consistency, or the similarity with other opinions; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the relationship, and extent of the relationship; (4) specialization, relating to the training of the source; and (5) other factors, including, but not limited to, the source's

---

[11] A "medical opinion" is a statement from a medical source about a claimant's limitations and ability to perform physical, mental, and other work demands, and to adapt to a workplace environment, in spite of her impairments. 20 C.F.R. §§ 404.1513(a)(2)(i)–(iv), 416.913(a)(2)(i)(A)–(D).

familiarity with other medical evidence and the SSA's policies and requirements.  20 C.F.R. §§ 404.1520c(a), (c), 416.920c(a), (c).

In assessing persuasiveness, however, an ALJ's chief task is to decide and explain whether an opinion or finding is supported by and consistent with the record.[12]  *Id.* §§ 404.1520c(b)(2), (c)(1)–(2), 416.920c(b)(2), (c)(1)–(2); *see* 82 Fed. Reg. 5844, at 5853 (describing these as the "two most important factors").  Explanation about the remaining factors is required only when an ALJ concludes that two or more medical opinions are equally supported by and consistent with the record.  20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).  Moreover, the rules dictate review of a provider's opinions on a collective basis, rather than opinion-by-opinion; negating the need for individual treatment of every medical opinion in the record.  *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1).  This framework guides the Court's review below.

**B.**  **The ALJ did not err in reviewing the opinions of the state agency psychological consultants and assessing plaintiff's RFC.**

State agency psychological consultants Howard Leizer and Joseph Leizer found that plaintiff has a moderate limitation in understanding, remembering, and applying information.  R. 97, 99, 115, 118.  They found that plaintiff was able to perform simple, routine tasks, and had no trouble following simple one to two step instructions, but could not follow detailed instructions.  R. 99–100, 118.  The consultants found plaintiff had mild limitations in her ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage herself.  R. 97, 115.

The ALJ appropriately addressed the supportability and consistency of the state agency

---

[12] Supportability is an internal review that requires an ALJ to consider how "objective medical evidence and supporting explanations presented by a medical source . . . support his or her medical opinion."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  By comparison, consistency is an external review that requires an ALJ to determine how "consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources . . . ."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

consultants' opinions pursuant to 20 C.F.R. §§ 404.1520c, 416.920c.  R. 28–29.  Except for the limitation to one to two step instructions, the ALJ found the state agency findings of Howard Leizer and Joseph Leizer to be persuasive and generally persuasive, respectively, noting that the findings were well-supported and consistent with the record as a whole.  *Id.*  The ALJ found the restriction to understanding and remembering one to two step instructions to be "overly restrictive and not as consistent with the record as a whole."  R. 29.  In making this finding, the ALJ relied on these factors:  (1) plaintiff denied that she had problems concentrating and reported to NP Langan in August 2021 that she had no trouble at all concentrating on things, such as reading the newspaper or watching television, *id.* (citing R. 1362); (2) mental status exams revealed plaintiff's memory was intact and unimpaired, including during plaintiff's hospital stay for her toe amputation in June 2020 and NP Langan's assessment in August 2021, R. 20, 28–29 (citing R. 488, 751); (3) plaintiff reported in her January 2021 function report that she could follow instructions well and could do things that potentially involve more than one to two steps, such as online shopping and preparing frozen dinners, R. 29 (citing R. 325–32); and (4) plaintiff previously worked in the semiskilled job of personal care assistant, R. 29 (citing R. 40–73); *see also* R. 20 (noting plaintiff's report that she completed high school online, lived alone, read the Bible, and used public transportation).  The ALJ concluded that these factors suggest that plaintiff is not limited to understanding and remembering only one to two step instructions.  R. 29.

Plaintiff asserts the ALJ's failure to include "the level or type of instructions [plaintiff] is capable of performing" in the RFC is problematic because limiting plaintiff's "ability to understand and remember detailed instructions creates apparent conflicts with Reasoning Level 2 . . . jobs."  Pl.'s Br. 10–11; *see* R. 99, 118 (state agency opinions that plaintiff could not follow detailed instructions).  VE Wells testified that a person plaintiff's age, with plaintiff's education

and work history, who could perform simple, routine jobs with certain physical limitations, was capable of performing work as a ticket taker. R. 68–69. The DOT categorizes ticket taker as a reasoning level two job[13], a job that requires an individual to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." *Ticket Taker*, DOT 344.667-010, 1991 WL 672863; *Appendix C—Components of the Definition Trailer*, DOT, 1991 WL 688702. Plaintiff argues that remand is necessary to require the ALJ "to define what limits on instructions are in the RFC or else give an actual explanation for why she is not including such limits," and to acknowledge and resolve any conflict between the limits on instructions and reasoning level two jobs.[14] Pl.'s Br. 12 n.8.

The ALJ addressed plaintiff's limitations in understanding, remembering, and applying information in the RFC assessment by limiting plaintiff to simple, routine jobs, which both Howard Leizer and Joseph Leizer found plaintiff capable of performing. R. 22, 28–29, 99, 118. The ALJ sufficiently explained why further limitation with regard to understanding and remembering one to two step instructions was not necessary. R. 29. The ALJ's review and discussion of the pertinent evidence—such as plaintiff's statements during the hearing and in her adult function

---

[13] The DOT describes the requirements for listed occupations, including the general education development level that ranges from level one (requiring the least reasoning ability) to level six (requiring the most reasoning ability). *Appendix C—Components of the Definition Trailer*, DOT, 1991 WL 688702.

[14] The ALJ found at step four that plaintiff could perform work as a cashier, gate guard, and ticket taker. R. 33. The Commissioner does not address whether there is a conflict between an RFC limitation to simple, routine jobs and reasoning level three jobs, such as cashier and gate guard. Def.'s Mem. 18. Accordingly, this report and recommendation will only address the job of ticket taker. *See* 20 C.F.R. §§ 404.1566(b), 416.966(b) ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.").

reports, mental status evaluations, and the state agency consultants' mental health assessments—sufficiently explained why the limitation to simple, routine work accounted for plaintiff's moderate limitations in understanding, remembering, and applying information.[15] Once the ALJ properly weighs all relevant evidence in the record, "the development of a claimant's RFC is solely within the province of the ALJ." *Kirkpatrick v. Kijakazi*, No. 1:20cv255, 2022 WL 392505, at *10 (W.D.N.C. Feb. 7, 2022) (citations omitted); *see* 20 C.F.R. §§ 404.1546(c), 416.946(c) (at the ALJ hearing, "the administrative law judge . . . is responsible for assessing your residual functional capacity.").

The Fourth Circuit, in *Lawrence v. Saul*, 941 F.3d 140 (4th Cir. 2019), held that limitations to both simple tasks and simple instructions were compatible with reasoning level two jobs. 941 F.3d at 143–44. It follows that limiting a plaintiff to simple, routine jobs does not conflict with the reasoning level two requirement of "carry[ing] out detailed but uninvolved written or oral instructions." *Appendix C—Components of the Definition Trailer*, DOT, 1991 WL 688702. Plaintiff's motion for a remand to first require the ALJ to define the limits on instructions and then acknowledge and resolve any conflict those limits have with respect to reasoning level two jobs, should be **DENIED**.

## C.   *The ALJ committed no error in evaluating Dr. Anderson's opinion.*

In November 2020, Dr. Anderson completed a medical source statement listing plaintiff's medical conditions, indicating her functional limitations, and concluding that plaintiff "needs [a] sedentary job." R. 1070.

---

[15] The Court notes that a "moderate limitation" means that a person has a "fair" ability to function in the area "independently, appropriately, and effectively on a sustained basis." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c).

Plaintiff contends the ALJ erred in rejecting Dr. Anderson's opinion that plaintiff is limited to sedentary work, because the reason for the rejection was inaccurate. Pl.'s Br. 12. Plaintiff asserts the ALJ rejected the opinion "based upon there being no objective findings, signs, or symptoms noted in the record indicating any problems with the ability to stand or walk after September 2020." *Id.* (citing R. 28). Plaintiff further asserts the ALJ failed to acknowledge Dr. Anderson's November 11, 2020 examination showing only 1+/4 pedal pulse in both feet and 1+/4 posterior tibial pulse in both ankles, "meaning she had only a 'faint' pulse in both of her ankles and feet due to severe constriction in the flow of blood and oxygen to her lower extremities." *Id.* (citing R. 1191). Neither of these assertions by plaintiff are accurate.

First, the ALJ did not reject Dr. Anderson's opinion "based upon there being no objective findings, signs, or symptoms noted in the record indicating any problems with the ability to stand or walk after September 2020." *See* Pl.'s Br. 12. Instead, the ALJ found Dr. Anderson's opinions were not well-supported or consistent with the record, explaining:

> Dr. Anderson did not provide any significant explanation for the assessed limitations, only identifying the claimant's medical conditions without noting any signs or symptoms. Podiatry records indicate the claimant's amputation was well-healed by September 2020. Subsequent records showed she had no paresthesia, burning, or numbness, and no edema or ulcers. Most records from February 2021 do not show physical exam findings other than to say that a diabetic foot exam was performed. As noted above, treatment notes do not show findings of significant weakness. Additionally, in August 2021, the claimant denied gait abnormality, loss of strength, and tingling/numbness. Therefore, the undersigned does not find the claimant to be as limited as Dr. Anderson opined.

R. 28 (citations omitted).

Second, the ALJ did not fail to acknowledge Dr. Anderson's November 11, 2020 examination notes indicating 1+/4 pedal pulse in both feet and 1+/4 posterior tibial pulse in both ankles. *See* Pl.'s Br. 12. The ALJ specifically summarized Dr. Anderson's findings from November 11, 2020: "[i]n November 2020, podiatry follow-up, [plaintiff] had 1+ pulses and no

edema.  She also had no paresthesia, burning, or numbness.  Her skin was warm with no scaling, vesicles, or stasis changes.  She had normal skin turgor and pigmentation, and no ulcers."  R. 25 (citations omitted).

Moreover, the ALJ appropriately addressed the supportability and consistency of Dr. Anderson's opinion pursuant to 20 C.F.R. §§ 404.1520c, 416.920c, and determined the opinion was not well-supported, not consistent with the record, and plaintiff was not "as limited as Dr. Anderson opined."  R. 28.

The supportability of Dr. Anderson's medical opinion turns largely on its relationship with any supporting explanation he provided, as well as upon whether the opinions align with and stem from relevant objective medical evidence.  *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  As noted by the ALJ, in Dr. Anderson's medical source statement, he merely listed plaintiff's medical conditions ("diabetic neuropathy, diabetic microangiopathy, and amputated 3rd toe right") without checking boxes to identify resulting symptoms, and without providing any supporting explanation for the functional limitations he assessed.  R. 28 (citing R. 1070).  This leaves Dr. Anderson's opinion unconnected to any findings and tests arising from treatment.  The ALJ pointed out that Dr. Anderson's treatment notes from February 2021 note only that a diabetic foot examination was performed with no examination findings noted.  *Id.* (citing R. 1189).  Substantial evidence supports the ALJ's assertion that Dr. Anderson's opinions were not well-supported.

Substantial evidence also supports the ALJ's determination that Dr. Anderson's opinions about plaintiff's functional limitations and need for a sedentary job were inconsistent with the record as a whole.  *Id.*  The ALJ summarized multiple foot assessments in 2020 and 2021 that support the finding that plaintiff is not "as limited as Dr. Anderson opined" such as:  (1) a July 6, 2020 assessment indicating her gait and stance were normal and her foot looked good without

23

drainage or swelling, R. 25 (citing R. 759); (2) a July 29, 2020 report that her foot was doing fine, *id.* (citing R. 733); (3) a September 17, 2020 report that everything was good although she had an aching pain in her foot due to neuropathy and an assessment indicating no redness, swelling, tenderness, ulcer, drainage, or induration to soft tissue, *id.* (citing R. 749); (4) a September 23, 2020 assessment that her amputation was well-healed without evidence of dehiscence or infection, *id.* (citing R. 777–78); (5) a June 2021 examination reflecting plaintiff had normal muscle tone, normal range of motion, and no leg swelling, *id.* (citing R. 1082–83); and (6) an August 2021 report that she had no gait abnormality, loss of strength, tingling, or numbness, *id.* (citing R. 1363).

The ALJ also considered the opinions of the two state agency medical consultants who found plaintiff capable of light work. R. 28–29, 101, 118. Based on plaintiff's complaints of pain, her obesity, her diabetic issues, and her toe amputation, the ALJ imposed additional postural limitations, limiting plaintiff to standing or walking four hours in an eight-hour workday. R. 22, 29.

The ALJ's determination that Dr. Anderson's unexplained opinions were inconsistent with the record as a whole, including the opinions of state agency experts, is well supported. Accordingly, substantial evidence supports the ALJ's analysis of Dr. Anderson's opinions, which addressed supportability and consistency as required by 20 C.F.R. §§ 404.1520c, 416.920c. Plaintiff's motion to remand due to an error in addressing Dr. Anderson's opinion should be **DENIED**.

## VI.    <u>RECOMMENDATION</u>

For these reasons, the Court recommends that plaintiff's motion for summary judgment (ECF No. 12) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 14) be **GRANTED**.

## VII.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 20, 2023